JOHN HOAGLAND v. NATHAN HOAGLAND and others.

Where a bill is filed for relief against a sheriff's sale of the complainant's property, on the ground that the purchaser was the agent of the defendant in execution, and purchased as trustee for him ; it is no objection to granting relief that the trust was not in writing.

Mere inadequacy of price affords no presumption that the property was purchased in trust for the owner.

THIS bill was filed for relief against a sale of the real estate of the complainant, made by the sheriff of the county of Warren, by virtue of an execution issued out of a court of common law.   The bill, among other things, charged, that the defendant, Nathan Hoagland, was the brother of the complainant; that he attended the sale as his agent, and purchased the property in trust for the complainant, to be reconveyed to him whenever the defendant should be reimbursed the expenses incurred and money advanced for the purchase.   The defendant's answer denied all the material allegations of the bill.   Evidence was taken by both parties, and the cause was heard upon the pleadings and proofs.

*P. D. Vroom*, for complainant.

*H. W. Green*, for defendant.

[Hoagland v. Hoagland.]

Cases cited by the counsel of the complainant. 3 *Wendell*, 626; 2 *Eden*, 286; 15 *Vesey*, 280; 2 *Sch. and Lef.* 492; 1 *Cox*, 112; 13 *Vesey*, 134; 1 *Fonb. Eq.* 124; *Jeremy's Eq.* 393; 3 *Cowen*, 537.

THE CHANCELLOR. This case covers transactions as far back as the years 1816, 1817, and 1818. The complainant at that time was possessed of considerable real estate, which he derived in part by devise from his father, and in part by purchase from others, and some personal property. He was then a young man, and dissipated in habits. He became in debt, was reckless in the management of his affairs, and executions pressed him, until in a very shoit time (as was to be expected from his course) his property was gone, and he was left to be supported by the charity of his friends. The brothers, Nathan and James, who seem to have been steady men, not willing to see the complainant's property go out of the family and be sacrificed at auction, conferred together about buying it in jointly, and as to the homestead did at one time agree to do so. Some difficulty, however, arose to their joint action, and Nathan, the defendant, finally became the purchaser of the greater part, if not all, of the complainant's estate. These various purchases by Nathan, are now attempted to be called in question, as having been made at the time on account of the complainant, and for his use and benefit, and the complainant claims to have his property restored to him again upon settling Nathan's account and paying him what he advanced, with his expenses and commissions for his trouble.

There are no questions involved in this cause between the two brothers who proposed to step in and buy the complainant's property. If they have any ground of controversy, it cannot be settled here; this cause can only dispose of the case as between the complainant and Nathan, and not as between Nathan and James. Whatever, therefore, might have been the good faith of the agreement at the time the homestead farm was sold, between Nathan and James, if the complainant was not to derive any advantage from it, he cannot complain.

[Hoagland v. Hoagland.]

As the complainant's property was disposed of at different times, it will be necessary to examine the circumstances attending the disposition of each parcel separately, with a view to show the course pursued by Nathan throughout. The bill states how the personal property was dispatched. The bill does indeed contain grievous accusations against the brother, and if true would call loudly for interference in behalf of the complainant; but the answer meets the charges fully in almost every instance, at all events so far as the matter of equity is concerned. The cause must, therefore, be decided by the evidence, which is voluminous and scattered over a wide range of unimportant, and I may say, trivial matter.

I propose to take up the charges in the order in which they are stated in the bill.

1. The first specific allegation is, that Nathan was indebted to the complainant, for cash lent, to the amount of sixty-six dollars, and gave him his duebill for it payable in ten days. Of this he paid complainant twelve dollars and fifty cents, and no more. That complainant, being indebted to one Robbins, gave him his note for forty dollars, and deposited with him as collateral security the duebill of Nathan. That he subsequently paid off the debt to Robbins, but he never returned Nathan's duebill. That the complainant subsequently became security for Robbins to one Coursen, for about forty dollars, who obtained judgment jointly against the complainant and Robbins. Upon this judgment execution was placed in the hands of a constable, who levied upon a horse, the property of Robbins, then in Nathan's possession, and that Nathan fraudulently suffered Robbins to take his horse away upon his giving up to Nathan his said duebill for sixty-six dollars. That Robbins ran away to Canada and left the complainant to satisfy the execution, when Nathan set up fraudulently that he had paid the note off, and produced it on trial as a discharged debt. The answer of Nathan gives quite a different version to this story. He admits giving the duebill to the complainant, and while in complainant's hands he paid upon it twelve dollars and fifty cents; but he says, afterwards, and

while it was in the hands of Robbins, he paid by complainant's consent to Robbins upon it the further sum of twenty-four dollars and sixty-seven cents, and being pressed by Robbins for the balance, he refused to pay it because he had a book account against the complainant, which was a just offset, for more than sufficient to pay what was due upon the bill, and that he and Robbins left it to a mutual friend to say what should be done about it, and that friend decided that Nathan should give his brother John a credit for the note on his account against him, which was so done, and the note given up to Nathan. The answer denies the whole story about the horse, and his suffering Robbins by collusion to take the same away. There is no proof adduced on either side respecting this charge, and the answer gives to my mind a satisfactory solution, and which in the absence of proof is to be taken as true. Besides, it appears upon the face of the bill, that the complainant brought a suit against Nathan on this note, and had a trial, and judgment was given against the complainant. This case, therefore, has been long since adjudicated upon, and in favor of Nathan, and should be for ever at rest.

2. A second charge is, that Nathan conspired with constables who had executions against the complainant, to sell in his absence, in one case six or seven hundred dollars worth of grain standing in shock on his place, and which Nathan bought in for a small sum of money; at another time, that he bought under like circumstances, a bed and bedding, and desk and bookcase; at another time, a cow and several sheep; and at another, several bushels of buckwheat. These cases are stated as oppressive proceedings prompted by Nathan, and done with a view to enable him to buy in complainant's property for a nominal sum. The answer fully denies the fraud charged, by declaring that the defendant knew nothing of the suits until the constables came with the executions; that he had no control over them, and gave no direction to the officers, and bought without any collusion with them whatever. The complainant's grain is represented as being in a bad situation, scattered over the land, and much of it grown

[Hoagland v. Hoagland.]

and ruined, owing to the wretched management of his farm. Independent of the answer, there is no probability that this brother would have acted so shameful a part as to combine with the constables to press him in this way; it is far more likely that the constables waited until their patience became exhausted and there was a necessity for action. The answer, at all events, denies every charge of combination and fraud, and the defendant claims to have purchased openly and fairly. There is no proof on this point either.

These matters, therefore, relating to the personal property, do not appear to be at all sustained, and probably were introduced more to throw a shade over the defendant's conduct, than from any expectation at this day of disturbing them. The great object of the suit concerns the real estate, and to that we must next in order turn our attention.

3. The complainant, by his father's will, had devised to him a part of the homestead farm, consisting of one hundred and eight acres, and two other pieces of meadow, one of twelve and the other of eight acres. This farm was sold by Daniel Swayze, esquire, sheriff of the county of Sussex, on an execution issued out of the common pleas of Sussex, on a judgment in favor of John Addis, and purchased by the defendant, Nathan, for thirteen hundred and twenty-eight dollars. The sale is loudly complained of, and constitutes the great object of this suit. The judgment on which the sale was made, was for six hundred and twenty-seven dollars and thirty cents, and there is no pretence that Nathan had any control over it, or any agency in obtaining it. The debt grew out of a farm which complainant bought, and to which purchase his pecuniary difficulties are in part ascribed. The charge is, that the complainant, being thus situated, applied to his brother Nathan, who was a man of property and standing, to help him; that he agreed to do so, and was to have a commission for his services : whereas, availing himself of his position, he became the purchaser of this property at a very low price, and now holds on and claims to have the sole and exclusive right to it. It is distinctly charged that he bought only

as the agent of the complainant, for which he was to receive pay, and as soon as he was repaid the money he advanced, with interest, which was then expected to be raised from the sale of other property belonging to the complainant, he was to give it up and reconvey the property to the complainant. This is the account given of the case by the complainant.

The defendant, Nathan, in his answer, states, that in February, 1818, while this execution was hanging over the complainant's property, he and his brother James frequently spoke of complainant's situation, and the certainty that his property would go into the hands of strangers unless they interfered about it : that Nathan being himself in debt, wished James to buy it alone, but he declined doing so, and it was finally agreed that they should buy it together. In the mean time they spoke to complainant about it, and he appeared indifferent, saying, he could get the money before the day of sale. The defendant says that he went with complainant to try to borrow money on mortgage, but failed in borrowing any, and the complainant keeping constantly intoxicated, it resulted in his and his brother James attending the sale and purchasing the property. Nathan took the title, and paid the money. From the answer it would not appear that any arrangement whatever was made with the complainant, but that he was treated as a man going to destruction, and the only question between the other brothers was, how they should manage to be able to purchase. Besides the natural aversion to let the homestead go out of the family, they seemed to have had a dislike to Addis's buying it and settling down between them, and they were well satisfied that if one of them did not buy it Addis would. There was a lease at the time on the farm to one Merrill, and a few days after the sale, according to the answer, Nathan and the complainant met the lessee, and he was directed to pay the rent (by the consent of the complainant) to Nathan as the purchaser of the property. The answer does indeed admit that after the sale, as an inducement for complainant to keep sober, Nathan did propose to him a plan by which he might regain his property ; but that plan was never carried into

effect, or even the writings drawn. There is a wide difference then, between the bill and the answer.

James Hoagland, the brother, is a witness, and is represented on all hands as a respectable man. If there be any person acquainted with the true state of facts in this case, it must be him. He was originally interested in the purchase, and actually paid part of the money. I have carefully looked into his evidence, which has been fully taken, and while it is obvious that he blames Nathan for not acting fairly with *him* in letting him in as part purchaser, I do not find that he aids the complainant in establishing the main point in this case, to wit, that Nathan bought in behalf of John. As Nathan and James bought jointly, he ought to know the fact if it were so, and yet he distinctly says as to himself, that he never saw John about the sale at all, and does not know that John knew of the arrangement between him and Nathan for purchasing the property. The conversation of these brothers would lead me to believe that they intended to pay all John's debts and to provide for his personal wants, but there is nothing that looks like his having the property again. Indeed, from his course of life and conduct, they could not suppose he would ever be in a situation to pay them off and take his farm again.

It would be dangerous in a case of this kind to proceed upon mere surmises. The sale was an open, public one, and made wholly independent of these brothers, and if their purchase was made in behalf of the complainant it should be plainly proved. Our statute, to avoid this very difficulty, requires all trusts relating to real estate to be in writing; and while this case may be distinguished from that of a mere trust by showing Nathan to have been John's agent and acting for him, yet there is great propriety in requiring the proof to be explicit. The deed was made to Nathan, he paid the money, and has always occupied the place as his own, and made very considerable improvements upon it. It is now more than twenty years since the sale was made. James says, that in his conversation with Nathan, as an inducement to him to join him in the purchase, he said, if

hereafter he wished to have the whole place, he would deed his half to him. How could this be if he was buying on John's account?

The sheriff, Daniel Swayze, esquire, is examined, but the sale was made by his deputy, he being sick at the time, and his deputy is dead. He knows nothing, therefore, respecting the sale, except a conversation which he had a few years afterwards, in which Nathan said all he wanted from John was what he was out of pocket for him. Such evidence may tend to corroborate a case already proved, but can never of itself defeat a title to property. It is very far from proving the terms of the purchase.

John Addis, the plaintiff in the execution, was present at the sale. The feelings of this witness are clearly opposed to Nathan. He says, that in a conversation with Nathan, he proposed that John should sell the farm he bought of him, and the Cook place, and take rent on the Merrill lease, which would pay John's debts and save him the homestead farm; and he adds, that he understood from Nathan that this was the bargain between him and John. But this proposal, he admits, was made after the farm was sold. There was much conversation about what course should be pursued with John's affairs and with him at different times, but it would seem to me that it was all left open down to the time of the sale of the homestead farm. The brothers meant to pay his debts, which it is alleged was done, and they expected, no doubt, to be burdened with his maintenance. From Samuel Shotwell's evidence, it is evident that Nathan desired to befriend John, by keeping him at his own house, offering him a room there, and by saying and doing nothing that would injure him. When he said in John's presence that the property was his, he only wanted to save it for him, it is manifest he said so to quiet his apprehensions and prevent any outbreak, for the witness adds, John was not satisfied with the offers made to maintain him, he wanted the place.

Without going over all the evidence, it is sufficient to say here, that there are several witnesses who detail loose conversations

[Hoagland v. Hoagland.]

with Nathan, going to show that he designed only to pay himself again out of John's property, but they do not satisfactorily show to my mind that any such obligation rested upon him. Nothing is more uncertain than to defeat an estate in lands by this kind of testimony. There has been considerable feeling manifested at Nathan's getting this property, and particularly with his course towards his brother James; but from a careful review of it all, I can find no sufficient foundation upon which to rest any conviction that he is bound to surrender it again to the complainant. He appears to have paid many debts voluntarily, to have been put to much expense and trouble on John's account, and from his whole course it is manifest that he never thought of being liable to render any account of his transactions, or of being called upon to give up the property. He kept no account of what he paid, and the whole character of the improvements placed on the farm shows that he considered it and treated it as his own. That the farm was worth more than it sold for, can constitute no ground for relief. It generally happens that more or less sacrifice takes place in these sales; they are forced upon the public, and it is natural and to be expected that property should bring less than its value.

4. About a year after the sale of the homestead, the Addis farm and the Cook lot were sold on another execution, and purchased also by Nathan, for one hundred and sixty dollars. There was a mortgage on the Addis farm at the time of six hundred dollars, so that the purchase amounted in fact to seven hundred and sixty dollars. Nathan, in his answer, denies all fraud in the transaction, says he bought very reluctantly, but with a determination to pay all John's debts, which he alleges he has done, except tavern debts, and these he refuses to pay. The bill charges Nathan with deceit, in promising to go and pay the money for John, instead of which he went and bought his property. This the answer also meets, by declaring that Nathan told complainant, who wanted him to go and adjourn the sale, that if he went he would go unshackled from all promises to him. The answer denies that there ever was any bargain be-

tween defendant and complainant respecting this property, but that defendant bought as any other person would.

James Hoagland does indeed say, in his deposition, that Nathan promised John to take the money of the Cook lot and pay off the claims of those pressing the sale of the Addis farm, but where the money for the Cook lot was to come from, or what were the circumstances under which this was said, does not appear. This may all have been said, and yet the sale be proper and the purchase good. The day for the sale had arrived, and yet it is manifest that he had no money from the sale of the Cook lot. About the time he got the sheriff's deed for the Addis farm, Nathan drew up and signed an obligation to give John a home at his house as long as he lived, and placed it in the hands of Joseph Coriell, esquire. John boarded at his house for more than two years at one time, and he has vouchers of debts paid for him of six hundred and twenty-nine dollars. The evidence is entirely too loose to disturb this sale.

This property has since been sold to Stinson by Nathan, and John was present and knew of the whole transaction. While the bargain was making, and until it was concluded, he made no objection nor set up any claim whatever. It is true the same evening, in one of his freaks, he made a noise about it; but after what had passed before, no person appears to have given any weight to what he said.

5. Two other lots were, it seems, sold by the Blairs on their execution, and purchased by them. Afterwards they sold these lots at private sale to Nathan for the full amount of their demands. There was nothing fraudulent or unjust in this transaction.

I notice that many years after the complainant's property was thus sold, he applied for and took the benefit of the insolvent laws of this state, and in his schedule then filed he declares that he has no real estate whatever.

Without meaning to say that Nathan may not, by his purchases, have acquired property which would call, possibly, for a more liberal provision for his brother under the circumstances in which he is now placed, (and yet I do not remember that he has

[Hoagland v. Hoagland.]

ever denied him a home with him or refused to assist him,) I still think there is a want of that certainty and directness in the proof that will justify me in calling him to account or disturbing him in the enjoyment of his property.   My reluctance to interpose is increased by the lapse of time.   More than twenty years have passed since these sales.   Many persons acquainted with the circumstances are dead, and at so late a day the memory of those that remain must necessarily be imperfect.   This bill was filed in 1827, and although the answer was put in the same year, the first evidence was not taken until 1837, ten years after.

I am of opinion, therefore, that the complainant's bill should be dismissed, with costs.